Thank you. May it please the court, Ilana Artson on behalf of the United States, I'd like to reserve five minutes and I will watch my time. When reviewing a wiretap order, the reviewing judge has two requirements to evaluate that are referred to in shorthand as the full and complete statement and necessity. And it's very important to be clear about which of those two buckets we're in because they have different standards of review. The full and complete statement requirement is basically looking at whether the accuracy of the facts in the affidavit are correct. Are there false statements? Are there omissions? It's similar to akin to the francs in the search warrant context. That is reviewed de novo. But the necessity requirement is reviewed for an abuse of discretion. And that's the question of whether those facts, those accurate facts, only require the government to show that either traditional methods haven't or are not likely to be able to uncover the entire conspiracy and prove beyond a reasonable doubt the charges against every member of the conspiracy. In this case, as the government laid out in its opening brief, there were no false statements or omissions. The defendants don't really dispute that. In fact, in the district court, they didn't even really claim that there was an absence of a full and complete statement. Counsel, as I read Judge Carter's order, he does fault you for omissions, but it seems to be omissions of completeness. It's like if I ask you, what did you do at school today? You said, well, we had lunch as usual and all of my teachers were there. I didn't have any substitutes. And your parents said, well, that was not a complete statement because you omitted everything that you discussed in American literature. So the mistake that the district court made here is exactly the same mistake that the district court made in Canales Gomez. What the court did here is it disagreed with the statements that were made in the affidavit to support necessity. But that disagreement goes in the necessity bucket, not in the full and complete statement bucket. And that's exactly what happened in Canales Gomez, where this court reversed a suppression order, stating that while the district court may not have been persuaded by the reasons given, there is no dispute. There can't be any dispute that there was a full and complete statement. What we have here is the district court disagreed with the necessity showing, and it tried to avoid the deferential standard of review by recharacterizing and calling those disagreements the absence of a full and complete statement. That is not the correct analysis. We are in the necessity bucket. And turning to that necessity bucket, there are two critical principles that the district court ignored. First, review is for abuse of discretion. The reviewing judge, be it the district judge reviewing the issuing judge or this court reviewing the issuing judge, a reviewing judge is not a Monday morning quarterback. A reviewing judge cannot reverse simply because he might have decided not to sign that wiretap order. The reviewing judge can only reverse if the decision to sign the warrant and find that there was necessity is illogical, implausible, or without support in inferences that can be drawn for the record. And secondly, necessity has to be evaluated in light of the goals of the investigation. The district court here ignored and violated both of those cardinal principles, and that's why it erred. That's why reversal is warranted. First of all, in this case, the district court focused almost entirely on what was going on inside the clinics. But the goals of this investigation were much broader. It was not only understanding the operation of the clinics, but also the distribution of the pills, understanding how the capping scheme worked, including how the patients are recruited as well. Just give me a short version of how the cappers operate. So this is not your traditional pill mill. In a traditional pill mill, a crooked doctor sets up business and addicts come in and they pay for prescriptions and they get their prescriptions and they go fill their prescriptions. That's not what happened here. Here there was a closed system. The affidavits made clear that there was a relationship between the cappers, the recruiters, and the patients. So the cappers would bring the patients. The cappers, Mabali and others, would either help them fill out some paperwork if that was necessary, or would sometimes simply distribute the prescriptions. Were they typically addicts or just folks out to make a little money? Your Honor, I don't know who all of those patients were, but they appear to be indigent people who were recruited. They were getting some money, but they were not paying for the prescriptions. The cappers pay for the prescriptions and they earn that money after they buy back the prescriptions and distribute those pills in the black market. And the cappers, you don't have cappers on the bottom of the caption here. You didn't indict cappers. Mabali was a capper and he was supervising the cappers. Okay, but there were lots of others who were not indicted. That's correct. Okay. What do we know about Massachusetts? We know that there were shipments to Massachusetts. What else would the government's proof show with respect to Massachusetts? Well, again, one of the important goals of the investigation was to understand the distribution scheme. So first it was identifying who that recipient was. And that was done in part through the wiretaps, where the wiretap intercept indicated that a package of pills was going to be sent and agents set up surveillance, watched Mabali and Harrison go to a FedEx and drop off a package, seized that package, got a search warrant, and discovered pills, but also saw who that recipient was. There was also a grand jury subpoena for financial records that helped identify Delva as the recipient. But that is not proof beyond a reasonable doubt against Delva. So a wiretap was necessary in order to figure out how the organization collected those pills to be able to send them to the recipient and then how the recipient paid for them so that the organization could pay for their prescriptions. Does that answer your question, Your Honor? Yes. Can you address the appellee's argument that the government defines an investigation too broadly to justify extensive wiretapping? What are the practical limits from the government always defining their investigation too broadly to make it easier to wiretap? So, first of all, I would say that it's defined broadly because that's how the defendant's conduct occurred. And that is not to say that there is no limitation beyond which you say, well, can you actually find every single conspirator? But that is not what happened here. The goals of this investigation were typical in a complex drug trafficking conspiracy and are similar to goals that have been approved in other cases such as Forrester or Canales-Gomez. So I don't think that we are close to the line of where the limit would be. We had six wiretaps. This is not an investigation that went on forever. And in each case, there were specific areas that were being targeted. For example, wiretap four against Juan Joji, he was the finance guy. Wiretap six, we included Barrios, who was… Remind me of the allegations against the finance guy. What was he doing, allegedly? So, he was kind of keeping track of money and pills. And he was distributing money to the cappers to be able to pay people like Cozart for their prescriptions and also paying to buy the pills. Who was laundering the proceeds? Did you figure that out? So, many of the defendants are charged with laundering. In fact, I think almost all of them were charged with laundering in some form. And part of the reason that a wiretap continued to be needed is that to prove money laundering, it's not enough to show where the money trail is going. We also have to prove knowledge and intent. We have to prove that all of those people know the source and have the intent to promote or conceal. So, wiretap was necessary to flesh out that aspect of the financial network as well. But one of the points that I think is also critical here about the capping is that you needed a gatekeeper to get into this clinic. And that is one of the reasons why until the very last wiretap, the government continued to have as an unmet goal trying to figure out how Mabali and others recruited patients so that they could get an undercover agent or an informant into the clinic. They were not able to do that until after the wiretap shut down. So, again, this is not a case where the goal is extended indefinitely. The wiretap shut down without having met that goal. Is there, in terms of defining the goals of the investigation, is there a formal document that says it? Or is it just more informal and then an agent explains that in the application for the wiretap? I'm not sure how to answer your question because I think what we have to look at is the four corners of the what those goals were. I don't think there's really a difference between what the agents had in their minds and what was set forth in the affidavit. Am I answering your question? Well, I guess, you know, maybe your opposing counsel will argue. But I assume they will say, well, if you just rely on the affidavit, does it give too much discretion, too much kind of ad hoc ability for the government to define it as broadly as it wants in the affidavit or describe it much more broadly in the affidavit? Well, I think the answer to that is that this court has consistently held that when investigating a conspiracy, the And we have to go back to, again, the standard is abuse of discretion. Did the issuing judge abuse his discretion given the various aspects of his conspiracy and the time period and the manner in which the conspiracy investigation progressed and ultimately concluded? You had a confidential informer, and it doesn't appear, and correct me if I'm wrong, that you made a great deal of use of that informer of Sabia, as I recall is the name. So Satya had one undercover sort of recording with a confidential informant who was a pharmacist. And then we sent in as a ruse a California medical board examiner after Satya had left to interview Satya and get some information about Dr. Corzelius. But Satya never agreed to cooperate. And it was clear from those interviews that Satya certainly couldn't deliver the whole conspiracy, didn't know about the capping portion, didn't know about the distribution of the pills. And that is a valid, has consistently been recognized as a valid limitation of informants. The question is, in evaluating necessity, can that informant deliver the whole conspiracy? Clearly, Satya could not. And Satya also never expressed willingness to act as an informant or wear a wire. Counsel, the affidavit on application three from Agent Pulaski details the subpoena that was issued, I think, to Wells Fargo that obtained bank records. But after that, the affidavit is silent as to whether it would have been useful to go after anybody else's bank records. So what that that seems to me to be one place in which it was sort of noticeably incomplete. Your Honor, no one has ever identified any other bank records that were available here that the government could have gone after. Many of the Harrison didn't have bank accounts. He used his wife's bank accounts. There have never been any any factual allegation here that there were other bank records that the government could have but failed to subpoena. I mean, could you, as in lieu of going for a wiretap, could you have sought the bank records for everybody that you were investigating at the time? Well, many of these people didn't have bank accounts. And again, the doctor didn't have a bank account. I don't know the answer to that, Your Honor. But again, the issue in these cases is knowledge and intent. It's not simply following a financial trail. And many of the doctors and physicians assistants were paid in cash. Unless my colleagues have any other questions, I think you've exceeded your time, but we'll give you two minutes for rebuttal. Thank you, Your Honor. And my understanding is for the appellees that you will split your time. Ms. Ferrantino, Mr. Schwartz. Yes, Your Honor. Whenever you're ready. Thank you. Corey Ferrantino representing Mr. Cozart. And I will split my time with Mr. Schwartz, but we are arguing as to all the appellees. Thank you. And may it please the court. I disagree with counsel for the government. We are not in the necessity bucket. Mr. Schwartz will be prepared to discuss the necessity issues in detail. But I would like to first talk about the standard of review and focus on the two-prong analysis that this court has delineated in several opinions. Number one, as this court is well aware, the reviewing judge sits in a very specific and unique position following the issuing judge's order of the wiretaps and the beginning of the criminal case. The reviewing judge is the first time that there's any adversarial proceeding where the parties can have a very thorough and robust discussion regarding the affidavits, the information set forth, and the allegations by the affiant whether or not these traditional procedural investigative tools are sufficient or not. And Rodriguez points to that very clearly in discussing the role of the reviewing judge and goes on to say that that judge then makes factual findings and those findings would be reviewed by clear error. And it distinguishes from a franks analysis as other courts do as well. There are several decisions out of this court where there is a separate franks analysis. And then once the franks analysis is disposed of, the court then moves to the two-prong analysis under the wiretap legislation. And the first prong is the Stanova review. And Carter made very clear that he was finding there was not a full and complete statement showing whether or not traditional techniques had been tried and failed. Counsel, when we review findings of fact for clear error, oftentimes we're looking for things in which the judges had an opportunity to review witnesses and things like that. Did Judge Carter hear any witnesses? Did he hear any testimony? He didn't in the traditional sense. That's a very good question. But what I will say to you is the government handed Judge Carter all the evidence that he needed to make this determination in the affidavits themselves. Okay, but we have those affidavits. In other words, do we sit in any different position from Judge Carter? What I was going to add to that is he did question the government's attorneys in the courtroom. I find it odd if the government's now going to say that those representations can't be trusted. The defense sought no need to cross it. Okay, all right. Counsel, I think I understand your position. So I want to get right to my questions. So when we review findings for clear error, we've got to be looking for findings in which a judge has said X occurred or X didn't occur and then look to see whether we think that that is correct. But as I review, as I look over Judge Carter's order, what he largely has done is just fault them for not providing further information. How do I review that for clear error? Because that seems to me that unless the agent is reporting actions in real time, something is always going to get left out of this. Well, I think if I understand the court's question, I think what he noted and what he asked the government about and allowed them an opportunity to explain was whether or not the inconsistencies in the other applications, where the government would say we couldn't use, for example, a trash search and then in another application they did a trash search or we couldn't do. That is the one point where it does appear that there was an omission by the government. It was corrected in a subsequent application. Judge Carter didn't note that that was corrected, and it's not clear that there was anything material. It doesn't look like the government found anything in the trash search. But that is the one point in which I think it is clear that something was omitted that should have been included. And I don't just mean to reference that for the omission, which I do agree with the court, but also in some of the whether it's pool cameras or the use of undercover agents, things of that nature. What I believe the judge was pointing out was that, or for example, the 6,000 pills that were found at FedEx, the government took issue with whether he called it a mail lookout or not, or a mail cover. And the point of what he was saying is this conspiracy was using mail couriers and mail services to deliver their pills. And it would have been fruitful to have a mail cover or have various techniques used to monitor these. OK, but on the mail on the mail cover, the court, the district court actually is clearly in an error on that one because he faults them for not using a mail cover and uses the FedEx as an example. But FedEx was not subject to a mail cover. The mail cover, as the agent explained, was only for USPS, though the district court actually is in clear error on that point. Well, but is it clear what the point of what he was saying is these are techniques that were fruitful or they would have been. Who's to say if they're using FedEx, why wouldn't they use priority mail? Well, this is a conspiracy. Right. But that's not a mail cover. Mail cover was a particular technique that is that is offered by USPS. And the agent did explain that that that they were concerned because they would have to have dealt with individual mail carriers. And it wasn't clear that the mail carriers could have been able to hold the confidence. But and that so but but the point is, priority mail is USPS. And and there's nothing to indicate these individuals wouldn't use priority mail like they would use FedEx.  But number two, that goes to the boilerplate language and the conclusion related language where they're basically talking about inherent limitations of normal investigations. And then to go on to say that the mail carrier can't be trusted, but they gave no case specific examples of that. I mean, can you trust the subpoena clerk at AT&T that's receiving a subpoena? Can you trust the poll camera vendor who installs the poll camera? They use individuals all the time to effectuate their their investigative tools. And here there's no evidence that American mail carriers can't be trusted. They give no indication that that's happened before. And I think the other thing is with their generalizations, what especially in the form of undercovers and CIs, which the court has already pointed to, they they compare this case to a Mexican mafia case. This was nothing of the sort. There may be generally a broad, you know, leeway and a conspiracy to investigate. But here this wasn't your typical conspiracy. This was a medical clinic. They could have subpoenaed payroll records, medical, medical regulatory records, all kinds of records. They couldn't have the bank accounts. The point here is that this was a it may not have been a Mexican cartel, but this was a pretty robust conspiracy. You had lots of people involved in it. You had interstate. It had an interstate component to it. And and it had a lot of moving parts. And I don't understand the the defense position that investigating a conspiracy of this type would have been potentially more successful by a more aggressive use of old cameras or trash searches. Well, I think that after all, I mean, with respect to FedEx, the FedEx lead was developed from a wiretap, wasn't it? It was, but it showed you that they were using those those means. And there was no investigation done to determine if they were using those means ahead of time. And chances are they were using them in many different ways, which we later saw. The bank I want to let Mr. Schwartz respond, but the bank records indicated that once they received them, one point two million had been deposited. And there were a lot of transactions that were below the reporting requirement that were suspicious. The but counsel, are there any did Judge Carter point to any specific omission here? Well, what he what he pointed to was that their justifications were not case specific. Right. But but but he but talk about boilerplate. Judge Carter went through point by point by point by point and raised the same objection to every point that they made. In other words, it's a boilerplate objection that they didn't provide enough evidence that suggests that he wouldn't have been persuaded. But I don't see that he's that he's noted any omission of something that had to be disclosed that was not disclosed. I don't think with it, with the exception of with the exception of the of the trash search of the of the Cairo Medical Facility. Look at the analysis for a full and complete statement. I don't think we're just looking at omissions. I think we're looking at the conclusionary language. And I think we're looking at the fact that that they're they're citing to inherit difficulties in all investigations. And they're not giving case specific facts. And he was very specific. He said, why didn't you put a poll camera up in the other direction so you could see the view? Why didn't you use undercovers to you? They could have picked up on patients that were leaving the facilities and gone back and interviewed them to see if any of them. The judge today noted how many people were going in and getting prescriptions. Those people were indigent. They were needing money. They probably have a lot of police contact. There was a wealth of individuals they could have contact. All of this to me, all of this suggests that Judge Carter would not have issued the wire tap if he had been the judge in the first instance. Well, I think, but I'm but I'm still I'm still struggling to find any omission that where the government neglected to tell Judge Carter something that it was obligated to tell him. And I haven't I haven't heard anything yet that suggests that. Well, there's the trash search, but I did. I did mention the trash search, but it wasn't material. They didn't find anything, but he omitted the case specific facts. They omitted the case specific facts that would support a finding that necessity, that this is a full and complete statement. Because they didn't cite to specific problems they were having with their investigation, like was done in Gonzalez and Rodriguez and Bargon. I reread. I reread this. The affidavit today for application three. I thought the agent was really quite complete. I'm going to let if I could let Mr. Schwartz speak to this, because I know that he also has input on this. May I? Of course. Thank you. May it please the court. Robert Schwartz on behalf of Dr. Corzillus. In my short amount of time, I would I would ask the court to please consider United States versus Gonzalez. That's which is a well-known case for 12 F3D 1102. And in my reading of the case, your honor, since we're talking about omissions that while the court is focusing in on on whether or not Judge Carter is pointing to a particular admission. Oh, mission rather in the in the Gonzalez case they were talking about. They found because it was there was a part of it that was a Frank's hearing that this did not have. But the analysis is the same that the statements that certain things could not be done or certain things that were. Try but not or failed or whatever those cases, they put the bucket, they put the same. They found that those statements, your honor, are in the first bucket, not just the necessity, but they were actually false statements that were in the affidavit itself. So I would I would urge the court to please reread United States versus Gonzalez's to that point. What were the false statements that were here? The false statements, your honor, I'll give I'll give the court. Give me give me your top three. So. My. There are so many, your honor, I realize that I mean, for example, I'll just give you by just I'll just give you an example. I only have to. So the government points that points out that there were no undercover agents that were that were introduced into this case. But in every pill mill case that I've I've seen or that I personally have worked on, they've always introduced pill mill undercover. And in here. They didn't do so until after well, after the last affidavit or application was done. But counsel was supposed to say that. And they and they said they explained why they hadn't didn't think that an undercover agent was required at this point. So this only works if if we must always use undercover agents because they will always be successful. I just don't I just don't see how that the answer that the government used in other cases is is case specific to this case. Respectfully, your honor, I, I, I, I respectfully disagree that in this case it was not case specific because the theory of their case was that they were not that these people were hanging around and getting prescriptions without a an examination at all. That was their argument. And yet their rationale for not using an undercover in their same in the same affidavit was that they were worried that they that the undercover would undergo a bad faith examination. That's that's that's an omission. That is just plain it's inconsistent. And I would argue that it's untrue. You can't you can't have your cake and eat it, too. You can't say one thing can't be done. And then and then and then belie that. And then the other part about it is they were able to effectively. I mean, an entirely separate investigation out of Costa Mesa was able to easily introduce. When when the affidavit was submitted in application three from from agent Pulaski, presumably Judge Selma looked at that and said, I find Pulaski credible as to the questions about about using an agent. And so how does Judge Carter get to review Judge Selma's judgment about that? Judge Carter might say, I'm not I wasn't persuaded. But how does Judge Carter get to say I wasn't persuaded and therefore I get to I get to reverse Judge Selma's order? I think it goes back to to to what Miss Ferrantino indicated. The court wants to to essentially and again, I respectfully if this is the court's position is, is that in this case, the court wants to just eliminate what Judge Carter has to say in this as the reviewing court that actually underwent a three hour hearing or hours long hearing in this case. And and then under Rodriguez, it indicates that this was our first opportunity, the defense's opportunity to test the government's case. And so, I mean, to accord Judge Carter with no deference at all, I would I respectfully submit that that is not the state of the law under Rodriguez, that the court should offer some deference in as much as, you know, instead of a 30 minute hearing that we have in total. That in fact, you know, Judge Carter was able to ask directly from the government their own questions, you know, and ferret out what the facts are and and then piece it together. And I mean, there's again there I have so many inconsistencies that demonstrate under the Gonzalez, especially where they're just not true. I mean, the idea that the government is saying that with respect to one jokey that he was the finance guy. And then but where is the evidence that they actually subpoenaed the finance guy? There is no indication in there that they actually did that. I mean, so and to begin and then just as a final point, I realize I'm over my time, but I would I would also note that if the government at the beginning in 2017 or, you know, they had been investigating the other L.A. Drug trafficking organization, they had spent two years on that case. And then the the leader of that of that organization pointed to the number one defendant in here. And for six months, they never did one thing, Your Honor. They they didn't surveil him. They didn't look for him. They didn't get his grand jury right. They did nothing. They went to the next guy. And then after that, there was very limited, very limited investigation. And then what happened is, is that magically they got wiretaps and that led them on a path. But that should not be how wiretap the, you know, should be, you know, be issued. Honestly, Your Honor, if if this case in terms of just the affidavit, this is there are so many inconsistencies that Judge Carter found that even under an abuse of discretion, Your Honor, this does not pass much muster on an abuse of discretion. I know I'm over time. Thank you for the court's indulgence. Thank you. So just a few brief points. The government agrees that there was no evidentiary hearing here and there were no factual findings that are reviewed for clear error. Instead, there was a disagreement that necessity existed. The government does not have to exhaust every conceivable alternative. That is a principle that has been repeated over and over and over again. In this court's cases, Judge Carter held the government to the wrong standard. Gonzales, Inc. is easily distinguishable from this case. There have been very few cases in this court that have suppressed wiretaps. In all of them, either there were false statements or omissions, which don't exist here. For example, in the Blackman case or in Gonzales, there was such a cursory pre-wiretap investigation that it couldn't be said that necessity existed. Here, there was a very robust pre-wiretap investigation. Nothing like in Gonzales, where all you had was five days of pen registers and a little bit of surveillance. Here, we had three months of pen registers and surveillance. We sent in informants. This is nothing like Gonzales. There was case-specific information about why an undercover was not introduced. Because a gatekeeper was required here, the government kept trying to get into the gate, and it did not succeed in doing that. Ultimately, this case comes down to whether Judge Selma abused his discretion. He did not. Judge Carter substituted his own judgment. For that reason, the suppression order should be reversed. Great. Thank you. Thank you to everyone for a helpful argument. The case has been submitted. You're adjourned for the day. Thank you.
judges: Parker, BYBEE, LEE